## D. J. GRIFFITH AND ANOTHER v. JAMES DOWD, SR. AND OTHERS.[1]

June 23, 1916.

Nos. 19,725—(82).

**Counterclaim — evidence — supplemental answer.**

In this action of replevin to recover the possession of a grading outfit, defendants answered, setting up as a counterclaim a cause of

[1] Reported in 158 N. W. 420.

133 M.—20.

action on an alleged oral agreement by plaintiffs to pay a specified sum per yard for alleged wet excavation work done by defendants under a subcontract with plaintiffs for railroad grading in Illinois. Plaintiffs then, by permission of the court, dismissed the case, without prejudice to the prosecution of the counterclaim. Defendants afterwards served an amended answer, setting up the same counterclaim, and also a second counterclaim based upon a cause of action for the alleged conversion of the grading outfit by plaintiffs long after the action had been dismissed. It is *held*:

(1) The evidence justifies the findings of the jury that such oral agreement was made, and this agreement was not void as being without consideration.

(2) The evidence does not justify the finding of the jury that the material removed by defendants for which they seek recovery in the first counterclaim, was "wet excavation," as that term is interpreted by the evidence.

(3) Certain settlement agreements entered into by the parties considered, and *held* to bar the cause of action set up in the first counterclaim, unless such agreements were procured by fraud, or were without consideration. These questions were for the jury, and the court erred in refusing to instruct in relation thereto.

(4) The cause of action for wet excavation, if any there was, was a proper counterclaim in this action.

(5) The cause of action pleaded as the second counterclaim was not an existing cause of action at the time the suit was commenced, and, therefore, could not be pleaded as a counterclaim. As the action had been dismissed, the cause of action cannot be considered as one set up by supplemental answer by way of set-off or recoupment.

Action of replevin in the district court for Mower county by the copartners doing business as the Griffith-McMurray Company against the copartners doing business under the firm name of James Dowd & Son. Defendants' answer set up a counterclaim as stated in the first paragraph of the opinion, and upon the motion of plaintiffs the cause of action set up in the complaint was dismissed, Kingsley, J., without prejudice to defendants' counterclaim as set forth in the pleadings and the prosecution thereof as though the order of dismissal had not been made. The case was tried before Quinn, J., and a jury which found the value of the personal property secured by the chattel mortgage was $10,092 and the value of the "wet excavation" work was $5,794.75, and answered in the affirmative the question whether defendants did any "wet excavation" work

under contract with plaintiffs and the question whether plaintiffs agreed to pay them an extra price for the wet excavation work, and returned a verdict for $7,102.09. Plaintiffs' motion for judgment notwithstanding the verdict or for a new trial was denied. From the judgment entered pursuant to the verdict, plaintiffs appealed. Reversed.

*Hadley, Cooper, Neel & Wright,* and *Sasse & French,* for appellants.

*McVey & Freet* and *Catherwood & Nicholsen,* for respondents.

HOLT, J.

Plaintiffs are railroad contractors of Kansas City, Missouri, and brought this action in replevin to recover a grading and camp outfit alleged to be wrongfully withheld by defendant, and damages for the detention thereof. The action was based upon defendants' alleged default in the payment of an $8,000 note secured by a chattel mortgage on the outfit, which was then in possession of defendants in Houston county, Minnesota. A bond of $25,000 was furnished, the statutory affidavit made, and the sheriff took the outfit into his possession. Defendants interposed an answer to the complaint, setting up the counterclaim for "wet excavation," hereinafter the subject of discussion, and plaintiffs replied to this counterclaim. Plaintiffs then asked the permission of the court to dismiss the case, and the court made an order of dismissal, without prejudice to the counterclaim, and its prosecution in the action as though no order had been made. Defendants then filed an amended answer, in which the "wet excavation" counterclaim was again set up, and a second counterclaim was pleaded, which will be noticed hereafter as the "conversion" counterclaim Plaintiff demurred to each of these counterclaims, the demurrer was overruled and plaintiffs replied. The issues so made by the answer and reply were tried before the court and a jury, with the result that a verdict was rendered in favor of defendants and against plaintiffs for the sum of $7,102.09. This sum was made up, as shown by the jury's answers to specific questions submitted by the court, as follows: $5,792.75 under the wet excavation counterclaim; $10,092.00 under the conversion counterclaim. After deducting the amount admittedly due plaintiffs on the chattel mortgage, the result was the amount of the verdict rendered. Plaintiffs then moved in the alternative for judgment in their favor notwithstanding the verdict or for a new trial. The court

denied this motion, and judgment was entered on the verdict. Plaintiffs bring the case here for review by an appeal from this judgment.

A number of troublesome questions were presented and ably argued by counsel for the respective parties. We here state those relating to the first counterclaim, based on an alleged oral agreement by plaintiffs to pay defendants a certain price per yard for whatever "wet excavation" they did under the contract for grading hereinafter mentioned.

(1) Does the evidence sustain the finding of the jury that this oral agreement was made, and, if so, was there a consideration for it? (2) Does it sustain the finding that defendants encountered and removed "wet-excavation" material, as that term is interpreted by the evidence. (3) Does the evidence sustain the finding that this cause of action, if there ever was any, was not barred by the settlement agreement hereinafter stated? (4) If all these questions are answered in the affirmative, and it be held that defendants, at the time this action was brought, had a cause of action on this agreement, was it a cause of action that could be the basis of a counterclaim in this action?

The facts necessary to an understanding of the above questions may be stated as follows:

Plaintiffs and defendants had their first business transaction in December, 1911, when plaintiffs loaned defendants $2,500 secured by a chattel mortgage on their grading outfit. By October 21, 1912, the indebtedness had increased to $8,500, and a new note and mortgage was given. Plaintiffs had a contract with Eastern Illinois & Peoria Railroad Company for the grading of some 30 miles of roadbed near Morrisonville, Illinois. In January, 1913, they sublet a contract for three miles of this work to defendants, who shortly after this moved their grading outfit to the scene and began the work. A new mortgage covering the outfit was then executed to plaintiffs to secure the $8,500, and accrued interest. Defendants continued on this work until May 23, 1913, when the railroad company became insolvent, and the work stopped. The claim for "wet excavation" arises out of work done by defendants in excavating a certain cut. The contract between them and plaintiffs provided that defendants should receive 14½ cents per cubic yard for earth excavation, and certain prices for overhaul, clearing and grubbing. Plaintiffs claimed that in excavating this cut they struck mud and water, caused by seepage, which

rendered the work very difficult and expensive. The claim for extra compensation is not based upon the original contract for the work, which was in writing and silent as to the pay for excavating material of this character, but upon an alleged oral agreement made while the work was being done. One of the defendants testified that Griffith, one of the plaintiffs, in response to a complaint that the work could not be done at the contract price, told defendants to "keep on working and we will pay you for this cut," promising to tell later on how much would be paid. Another of the defendants testified to a conversation with McMurray in St. Louis in May, 1913, just before the work stopped, in which McMurray agreed that defendants would receive $2.50 per yard for whatever wet material they execavated. It is this agreement to pay $2.50 per yard for wet excavation that is the basis of the first counterclaim, plaintiffs claiming to have removed from the cut 7,000 yards of this "wet excavation."

During the progress of the work plaintiffs had advanced more money to defendants. On June 21 the mortgage became due, and under the Illinois law action had to be taken to preserve its lien. Mr. Griffith, one of the plaintiffs, with his attorney, went to Morrisonville, where they met defendants and their attorney, and the terms of a settlement were discussed and a written agreement was entered into and executed by plaintiffs and the defendant, James Dowd, Sr. This agreement recites that the second party is indebted to the first party in the sum of $8,698.34, evidenced by a promissory note secured by a chattel mortgage; that the second party claims to have an indebtedness against said first party of $5,500, which claim is disputed, and that for the purpose of adjusting any controversy between the parties it is agreed between said parties "that the said indebtedness above referred to, together with other indebtedness due and owing by second party to first party, shall be settled as follows: The second party (James Dowd, Sr.) to give his note for $8,000, due in 90 days, secured by a chattel morgtage on the grading and camp outfit, which note and mortgage, executed and delivered at the time of the settlement agreement, were to secure the indebtedness until the execution of another note for the same sum, and a chattel mortgage signed by Dowd and his wife, the last note and mortgage to be in lieu of those executed at the time the agreement was made. In consideration of the execution of this

note and mortgage, and a cash payment of $108, the second party "hereby releases first party from all claims and liabilities under said alleged claim of $5,500, intending hereby that this contract shall be a full settlement between the parties and releasing all claims of every kind and character, whether specifically mentioned or not." Then follows this language:

"It is further stipulated and agreed by and between the parties hereto that whereas said second party asserts that he has a claim for extra pay for what is termed 'wet excavation,' amounting to upwards of $17,500, for work performed for the Eastern Illinois & Peoria Railroad Company, it is hereby agreed that in the event that first party is enabled to collect any sum from said railroad company by virtue of said claim, then said sum so collected is to be and become the property of said second party, less whatever profit is due first party as general contractor on the contract of said second party as subcontractor by virtue of said claim, it being further agreed that said second party shall have the right, if he so elects, to proceed directly against said railroad company for the purpose of attempting to collect said alleged claim."

Three days after the execution of the above agreement, the parties signed a supplemental agreement, reciting that the papers contemplated in the first agreement have been executed and that the execution of the $8,000 note and mortgage, and of a note for $858, secured on Kansas City property, "leave but one and only one undisposed of matter, to-wit: the matter of wet excavation upon the work in Illinois, as to which there is no controversy between the parties hereto as between themselves, but any liability which may exist as to such work is to be jointly asserted against the railroad company.

The $8,000 mortgage then executed was filed in Illionis, where the outfit then was. On its removal to Iowa in July, 1913, a new mortgage was given under the Iowa law. In August defendants removed their outfit to Houston county, Minnesota, and a new mortgage in the Minnesota form was given and filed. It is this chattel mortgage which formed the basis of this action in claim and delivery to secure possession of the outfit.

1. The claim that plaintiffs agreed to pay defendants $2.50 per yard for whatever wet excavation they did in the cut, rests wholly upon the testimony of defendants above referred to. We think this evidence, though contradicted, made the question one of fact for the jury, and that the

verdict cannot be interfered with on this point. Plaintiffs claim that this agreement, if made, was without consideration and therefore void. They rely on the rule that a promise of extra pay to a contractor for work he has already agreed to do for a certain price is void for lack of consideration. This principle is elementary and no citation of authority is necessary. But construing the alleged agreement as we do, not as a promise to pay extra for the material removed from this cut, even though it properly came within the "earth" classification, but as an agreement to pay so much per yard for work that could be properly classed as "wet excavation," we think the principle invoked does not apply. If the original contract was for excavating earth, and nothing said about excavating under water, and the latter and much more expensive work for which no price had been fixed, was unexpectedly encountered, an agreement to pay extra for this work would not be *nudum pactum*. Shephard v. St. Charles Western Plank Road Co. 28 Mo. 373; Blair v. Corby, 37 Mo. 314; Dubois v. Delaware & Hudson Canal Co. 12 Wend. 334; Spaulding v. Coeur D'Alene & N. Co. 5 Idaho, 528, 51 Pac. 408.

2. The agreement was not to pay extra for excavating this cut, but to pay for whatever "wet material you have there." The sense of this is that, to entitle defendants to the extra pay, the material removed must come under the classification "wet excavation," as that term is generally understood as used in contracts for excavating. The question, therefore, is as to the character of the material found in this cut, and as to whether the evidence fairly showed that it was "wet excavation." First as to the evidence relating to the kind of material encountered: It was mud, caused by water seeping up from below, as claimed by defendants; by rains, plaintiffs insist. There is no doubt that it was much more expensive to move than ordinary earth, but it is fairly clear that it could be and was removed with the equipment that defendants had, and without the construction of coffer-dams, the use of dredges or pumps. It was simply wet, sticky earth, or, as stated, mud, and not excavation under water. The material was encountered while making a cut through a hill, and was removed by mules attached to plows and scrapers. The conditions were such that a traction engine and grader could not be used, and some of the mules became mired in the mud and had to be extricated.

We have examined with care the evidence as to what was the proper

classification of this material. Defendant G. R. Dowd testified that there was a classification known in railroad work as "wet excavation," and that the material excavated in this cut was "wet excavation." A witness for plaintiff who had testified as a railroad contractor of experience that the material in question was not classed as "wet excavation," spoke of one instance where he had a wet-excavation classification in a contract for the Rock Island, and was allowed under it for excavating material such as found in this cut. Aside from testimony tending to show that excavating material such as encountered was much more expensive than removing ordinary dirt, a proposition that hardly needs expert evidence to establish, this is all the evidence which tends to show that the work in question would come under a "wet excavation" classification. For plaintiffs seven witnesses testified, including three railroad civil engineers, and four rail-road contractors, all of long experience. Of these witnesses two were the plaintiffs in the present case, one was the chief engineer and another the resident engineer in charge of the work in question. They were all positive that "wet excavation" as that term is used in classifying material in construction work, means excavation under the water line, material taken out under water, as in excavating foundations for piers, abutments and so forth across rivers or creeks, and where often coffer-dams and the use of pumps or dredges are necessary. These witnesses are uniform in their testimony that muddy or sticky ground, whether caused by rains or the seepage of water from below, is not within a "wet excavation" classification. We will not further pursue the discussion of the evidence on this point. It can hardly be said that there was no evidence to support defendants' claim, but we think it must be said that the weight of the evidence is so overwhelmingly against it that we should not allow the verdict on this cause of action to stand. Whether or not this cause of action should be out of the case for good, both as a counterclaim and as the basis for a future suit against plaintiffs, depends upon the effect of the settlement agreement, which is next to be considered.

3. The "wet excavation" claim was not compromised or finally settled by the contracts of June, 1913, in the sense that it was wiped out of existence as a claim against anybody. But it seems to us that there was a clear agreement that the claim was against the railroad company, and not against plaintiffs. The first agreement specifically recites that the con-

tract is intended to be a full settlement between the parties of all claims of every kind and character, whether specifically mentioned or not, and then recites the claim for wet excavation that defendants had, and provides for its prosecution against the railroad company. The second agreement says that the matter of wet excavation is undisposed of, but that there "is no controversy between the parties hereto as between themselves," but that any liability as to such work is to be jointly asserted against the railroad company. This was a perfectly natural and just arrangement. Defendants would not be entitled to an allowance for this work, unless plaintiffs were able to obtain it from the railroad company under their contract. It also is in entire accord with the books kept by defendants, which contained charges against plaintiffs for the amount of earth removed, but nothing to indicate any claim for wet excavation, and with the entire conduct of defendants after the agreements were made, tending strongly to show that they considered that they had no such claim against plaintiffs, not asserting it until long afterward. Unless the effect of these agreements can be obviated on one of the grounds urged and hereafter considered, we think that they preclude defendants from now asserting as against plaintiffs the claim for wet excavation.

Defendants claim fraud and no consideration. Counsel base their claims upon the alleged fact that plaintiffs, at the time it was so agreed that defendants might use their names in asserting the claim against the railroad company, had already presented the final estimate for all work done under the contract and had received payment therefor in full. The argument is that this situation was concealed from defendants, that this constituted fraud which obviated the agreement, and that as the claim against the railroad company could only be presented in plaintiffs' name, and plaintiffs had thus barred themselves from making the claim, there was no consideration for the agreement of defendants. The evidence is such that we can not say that this issue was not for the jury. It is not very persuasive, but a finding that this final payment had been made and that this was concealed from defendants, might be sustained, had the issue been properly presented by the pleadings and properly submitted to the jury by the trial court. There was no reference to fraud in the pleadings, and no reference to either fraud or want of consideration in the charge. This was error; the point is very material and was saved by defendants.

Our conclusion on the matter of the wet-excavation cause of action, stated in a word, is that there must be a new trial, because the verdict is not sustained by the evidence, and for the errors in the charge referred to, but that we are unable to hold as a matter of law that defendants have no cause of action.

4. There remains a question that does not go to the merits of the "wet-excavation" cause of action, but concerns the right to assert this cause of action as a counterclaim in this replevin suit to recover the grading outfit mortgaged. As we have stated, plaintiffs demurred to this counterclaim, and the demurrer was overruled. We have only to consider the correctness of this ruling, as the question whether a cause of action pleaded is or is not a proper subject of counterclaim in the particular action can only be raised on demurrer. 2 Dunnell, Minn. Dig. § 7619. W. W. Kimball Co. v. Massey, 126 Minn. 461, 148 N. W. 307. It is the allegations of the pleading which control, not the facts as they develop on the trial. In the answer defendants attempted to show that this cause of action arose out of the contract or "transaction pleaded in the complaint as the foundation of plaintiffs' claim," which may be stated to be the giving of the chattel mortgage, or that it was "connected with the subject of the action," which may be said to be the property sought to be recovered, or plaintiffs' right to its possession. We doubt very much whether this attempt was successful, as it is very difficult to see any connection between the claim for wet excavation, and the giving of the chattel mortgage, or the property covered thereby. But it seems to us that if plaintiffs' action was one rising on contract, the counterclaim was properly pleaded as "another cause of action arising also on contract and existing when the action was begun," under G. S. 1913, § 7757, subd. 2. Under this subdivision a cause of action *ex contractu* may be set up as a counterclaim, although wholly unconnected with the cause of action set up in the complaint. 2 Dunnell, Mill. Dig. § 7611. The case of W. W. Kimball Co. v. Massey, cited above, is authority for the proposition that the defendant in an action of replevin may interpose a counterclaim, if the cause of action is connected with the subject of the action. We see no reason why the same liberal construction is not proper where the counterclaim is "another cause of action arising on contract." We think the demurrer to this counterclaim was properly overruled. We may say that

the fact that James Dowd, Sr. and his wife gave the mortgage, while the cause of action pleaded in the counterclaim belongs to the partnership, does not affect the case. Plaintiffs' cause of action was against the partners, and the partners pleaded the counterclaim.

This is all that will be said as to the first counterclaim.

5. The facts which form the basis of the second or "conversion" counterclaim are these: The American Surety Company of New York was surety on the $25,000 replevin bond furnished by plaintiffs. On the day the action was commenced the sheriff took possession of the outfit under the writ. Defendants afterwards rebonded, furnishing to the sheriff for the use of plaintiffs an undertaking in the sum of $12,000, and the property was returned to defendants. P. E. Shugart of Nevada, Iowa, had obligated himself to the surety company in arranging for it to furnish the bond for defendants, and, to save Shugart from loss on his obligation, defendants executed to him a bill of sale of the outfit which was recorded, defendants, however, retaining possession. After this defendants removed the outfit to Iowa, where the bill of sale was recorded. In August, 1914, defendants turned the grading outfit over to Shugart to take care of, the machinery and camping outfit being stored, and the horses and mules placed in Shugart's pasture for the winter. In November, 1914, Shugart, claiming that he desired to be relieved from his obligation to the surety company, turned the entire outfit over to plaintiffs, who then sold it to Shugart for $7,300 in cash. Defendants' claim that this sale was a conversion, and the second counterclaim is to recover damages therefor.

In our view of this counterclaim, we do not reach the merits. As we feel obliged to hold, for the reasons stated below, that this cause of action could not be pleaded as a counterclaim in this action, it is undesirable that we indicate any opinion on the merits. Both parties are nonresidents of this state, and it is most likely that the courts of some other state will ultimately have to decide whether this sale constituted a conversion. For this reason, and because the laws of this state would not control, it seems better to leave this question undecided.

This action was dismissed without prejudice to the counterclaim that had been set up, that to recover for the alleged wet excavation. The alleged conversion took place more than a year after the action was brought, and after its dismissal. A cause of action to be properly pleaded

as a counterclaim, must be one that exists in the defendant at the time the action is commenced. Hackney v. Fetsch, 123 Minn. 447, 143 N. W. 1128; 2 Dunnell, Minn. Dig. § 7605, and cases cited. There was a demurrer to this counterclaim, and plaintiffs can have reviewed on this appeal the order overruling it. We see no escape from the conclusion that this cause of action, arising as it did long after the commencement of the action, could not be asserted as a counterclaim.

The trial court suggested in his memorandum that it was unimportant that defendants labelled the cause of action "counterclaim," and that it would have been proper to set up the matter in a supplemental answer as a defense, by way of set-off or recoupment to plaintiffs' claim. This seems to us fallacious. There was no longer any claim of plaintiffs, as their case had been dismissed. There was nothing to set off the conversion claim against, nothing to "recoup." It was plainly an attempt to plead an independent affirmative cause of action as a counterclaim, and it could be nothing else under the circumstances.

The judgment appealed from is reversed; a new trial is granted as to the cause of action involved in the first counterclaim; as to the second counterclaim, the trial court will sustain the demurrer thereto, on the ground stated in this opinion.